UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KIMBERLY JEFFERY-WOLFERT**

      **Plaintiff,**

v.

**UC HEALTH,**

      **Defendant.**

**CASE NO.: 1:16cv656**

**Judge Michael R. Barrett**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Doc. 7). Plaintiff has filed a response (Doc. 10) and Defendant has filed a reply (Doc. 13).

**I.  BACKGROUND**

For purposes of this Motion, the facts alleged in Plaintiff's Amended Complaint are accepted as true. From January 2013 – November 2015 Plaintiff was an Infection Preventionist for Defendant.[1] (Doc. 3, ¶ 10). Plaintiff's job included overseeing issues related to infection prevention and outbreak investigations. (Id. at ¶ 12). In May 2015, Plaintiff was tasked with beginning a comprehensive investigation of hospital acquired *Stenotropomonas* cases. (Id. at ¶¶ 13, 15). Plaintiff's initial review indicated a significant increase in cases in the neuro-intensive care unit ("NSICU") and a slight increase in other intensive care units. (Id. at ¶ 16-18). Most of the cases involved bronchoscopy procedures, raising concerns about the bronchoscopy cleaning process and travel ventilator contamination. (Id. at ¶¶ 19, 25). Further investigation led

---

[1] Plaintiff began her employment at Drake, but transferred to the main campus in April 2014.

1

to issues regarding used and possibly infected bronchoscopes being left in rooms after procedures. (Id. at ¶ 38). Based upon these concerns, a formal complaint was made to the Occupational Safety and Health Administration ("OSHA"), particularly in connection with the transportation of used bronchoscopes.[2] At least one specific scope, Scope #11924, cultured positive for *Stenotropomonas* in June 2015. (Id. ¶ 47). As a result, high level disinfection procedures were implemented. (Id. at ¶ 49). While cases declined initially following implementation, cases began to rise once again in August. (Id. at ¶ 53). At least one more scope, which had tested negative in June, tested positive in late September. (Id. at ¶ 60). Plaintiff was concerned that not enough was being done to protect patients from exposure. (Id.). Specifically, she was concerned that no reports were made to the Food and Drug Administration ("FDA"), in the face of an obligation to do so. (Id. at ¶ 57). According to Plaintiff, risk management was not fully informed either. (Id.).

Despite voicing these concerns to her supervisor, Dr. Sopirala, Plaintiff was told to "please take care of it." (Id. at ¶ 58). Her concerns continued to be ignored for fear of an audit. (Id. at ¶ 59). Feeling helpless in facing her ethical dilemma alone, Plaintiff met with an employee assistance counselor. (Id. at ¶ 61). Following the counselor's recommendation, she contacted the hospital safety hotline and arranged a meeting with human resources personnel. (Id. at ¶ 62). Her concerns continued to be largely ignored or downplayed and thus, Plaintiff did not have the authority to take the necessary action to combat the infection outbreak. (Id. at ¶ 63-64). Defendant also ignored the bronchoscope manufacturer's instructions to use an alternative method of sterilization, in part, due to costs. (Id. at ¶ 65-67).

---

[2] According to the Amended Complaint, used bronchoscopes were transported in cheap plastic Tupperware type containers. (Id. at ¶ 40).

After issuing further reports and recommendations, Plaintiff was told the issues would be addressed.  (Id. at ¶ 72-74).  Dr. Sopirala remained hesitant to seek assistance from an outside agency for fear of a hospital audit.  (Id. at ¶ 77-78).  In fact, Plaintiff was reprimanded and told she was not to report to any outside agencies.  (Id. at ¶ 80).  Plaintiff then requested a meeting with the nursing director who appeared shocked when Plaintiff provided her with information regarding the investigation.  (Id. at ¶ 82).  Plaintiff was assured that the information would be shared with Dr. Sopirala's supervisor.  (Id. at ¶ 84).  Subsequently, Plaintiff was removed from her role as investigator of the *Stenotropomonas* outbreak, along with several other projects.  (Id. at ¶¶ 84, 87).

On November 4, 2015, Plaintiff advised the Joint Commission for the Accreditation of Healthcare Organizations ("JC") of the situation, including the lack of responsiveness of Defendant.[3]  (Id. at ¶ 88).  She also notified the health department.  (Id.).

On November 13, 2015, Plaintiff submitted her two week notice of resignation.  (Id. at ¶ 89).  Before leaving, Plaintiff attempted to meet with personnel one more time in order emphasize the seriousness of the infection outbreak.  (Id. at ¶ 90).  She requested that an ad hoc ethics committee be convened within her two-week notice period.  (Id at ¶ 90-92.).  That afternoon, Plaintiff was told to turn over her badge and keys and was asked to leave the premises.  (Id. at ¶ 93).

As a result of the foregoing, Plaintiff alleges that she was subjected to a hostile work environment.  (Id. at ¶ 96-97).  Despite having stellar performance evaluations in the past, she began receiving negative evaluations, including being removed from projects.  (Id. at ¶ 98).  She was also reprimanded for looking up her own medical records on the hospital's computer system,

---

[3] According to the Amended Complaint, JC is an organization made up of individuals from the private medical sector who develop and maintain standards of quality in medical facilities.  (Doc. 3 at ¶ 88).

being advised she would be terminated if there were further issues. (Id. at ¶ 99). In short, Plaintiff alleges she was in constant fear of retaliation for doing her job. (Id. at ¶ 105).

Plaintiff brings the following claims: 1) retaliation; 2) hostile work environment; 3) whistle blower violation pursuant to § 4113; 4) intentional infliction of emotional distress; and 5) punitive damages. Defendant moves for dismissal of all of Plaintiff's claims.

## II. STANDARD

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotations omitted). To properly state a claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]o survive a motion to dismiss, a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. ANALYSIS

### 1. Retaliation

Plaintiff brings claims for retaliation under Title VII, 42 U.S.C. 2000e *et seq.*, 42 U.S.C. § 1981 and the Ohio Civil Rights Act, Ohio Revised Code § 4112.01, *et seq.* Claims brought

under Title VII and Ohio's anti-discrimination statute are evaluated under the same standard. *Thompson v. UHHS Richmond Heights Hosp., Inc.,* 372 Fed.Appx. 620, 623 (6th Cir.2010). To establish a prima facie case of retaliation, Plaintiff must show: (1) she engaged in protected activity, (2) Defendant was aware of the protected activity, (3) Defendant subsequently took an employment action adverse to Plaintiff, and (4) a causal connection exists between the protected activity and the adverse employment actions. *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir.2003) (citing *Strouss v. Michigan Dep't of Corr.,* 250 F.3d 336, 342 (6th Cir.2001); *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000)).

Plaintiff alleges the protected activity in which she was engaged was her job. The Court disagrees.

42 U.S.C.§ 2000e-2(a) in relevant part makes it unlawful for an employer to:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).[4] Accordingly, Plaintiff must establish that Defendant discriminated against her as a result of one of the above, or in other words, the discrimination related to her membership in a protected class. Plaintiff has failed to do so. Rather, Plaintiff argues, for example, that she was retaliated against because she recommended reporting the infection outbreak to the FDA and local health department. More generally, Plaintiff argues she was retaliated against because she brought to light improper conduct on the part of Defendant. While this might be true, Plaintiff has not alleged she was discriminated against because of her race,

---

[4] Similarly, the Ohio anti-discrimination statute makes it unlawful for an employer to discriminate based upon race, color, religion, sex, military status, national origin, disability, age, or ancestry. Ohio Rev. Code 4112.02(A).

5

color, religion, sex, or national origin. Thus, under Title VII and the Ohio Revised Code, Plaintiff's retaliation claim fails as a matter of law.[5]

### 2. Hostile Work Environment

Plaintiff also fails to state a claim for hostile work environment. Plaintiff generally alleges that she faced daily criticism and hostility, and that Defendant's actions created an abusive work environment. As explained above, however, Title VII does not protect against all forms of workplace hostility, only the same related to race, color, religion, sex, or national origin. Accordingly, Plaintiff has failed to state a claim.

### 3. Whistle Blower Violation

Defendant argues Plaintiff's claim under Ohio Revised Code § 4113.52 ("the Whistleblower Act") must be dismissed because it was filed beyond the statute of limitations – 180 days. Ohio Rev. Code § 4113.52(D).

Plaintiff resigned on November 13, 2015. (Doc. 3 at ¶ 89). Plaintiff does not allege any violation after that date.[6] Yet, Plaintiff did not file her claim under the Whistleblower Act until July 5, 2016 – more than 180 days after the alleged violation. Nor did she file her original complaint within 180 days of her resignation.

Nevertheless, Plaintiff argues the statute of limitations did not begin to run on the date Plaintiff resigned, but rather, on the date the EEOC issued a right to sue letter. The Sixth Circuit has not specifically addressed this issue. Multiple other circuits, however, have determined that filing an EEOC charge does not toll the statute of limitations for state tort claims arising from the

---

[5] Plaintiff argues she was constructively discharged. Because the Court concludes that Plaintiff fails to state a claim, the Court need not address whether the constructive discharge doctrine applies.
[6] Plaintiff arguably alleges a violation occurred after she requested that an ad hoc ethics committee be convened. Plaintiff does not specify the exact date she did so, but it is undisputed that action occurred within her two-week notice period. Even if the Court uses that date for purposes of a statute of limitations analysis, the result remains the same.

6

same underlying facts as the EEOC charge. *See Castagna v. Luceno*, 744 F.3d 254 (2d Cir. 2014); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 323 (7th Cir. 1992); *Arnold v. United States,* 816 F.2d 1306, 1313 (9th Cir.1987). For example, in *Castagna*, the Second Circuit rejected the plaintiff's judicial economy argument, holding that "there is no basis for concluding that Congress intended that a civil rights claimant should be entitled to delay filing any state tort claims during the EEOC's consideration of a charge of discrimination." *Castagna*, 744 F.3d at 258.

As the Second Circuit explained, this conclusion is in accord with the United States Supreme Court's decision in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, syllabus (1975). In *Johnson*, the Court held that the filing of an EEOC charge does not toll the applicable statute of limitations period for an action based on the same facts, instituted under 42 U.S.C. § 1981. *Id*. at 455. The Court explained that "[t]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable and federal statutes." *Id.* at 459. Thus, while the Court determined that a plaintiff may ask a court to stay proceedings in the initial action until the EEOC's administrative review is complete, tolling was not warranted because the plaintiff always had "an unfettered right" to pursue her tort claims. *Id.* at 465-66.

At least one district court in this circuit has also found that the filing of an EEOC claim does not toll the statute of limitations for claims based on state law. *See Macklin v. Turner*, No. 1:03-cv-2347, 2005 WL 2211170, *3 (N.D. Ohio Sept. 9, 2005) (finding summary judgment appropriate because plaintiff's Ohio age discrimination claim was barred by the statute of limitations).

7

Considering the foregoing, the undersigned finds the Second Circuit's opinion persuasive and reaches the same conclusion. While Plaintiff's retaliation and hostile work environment claims pursuant to Title VII could not have been brought in this Court until the EEOC issued its right to sue letter, the same cannot be said for Plaintiff's state law tort claims.

Plaintiff had the right to bring her claim under the Ohio Whistleblower Act beginning on November 13, 2015. She failed to do so within 180 days. Ohio Revised Code § 4113.52(D) specifically provides that if an employer takes disciplinary or retaliatory action against an employee, the employee may bring a civil action "within one hundred eighty days after the date the disciplinary or retaliatory action was taken." Ohio Rev. Code § 4113.52(D). The statute does not include language with respect to tolling of the statute of limitations and thus, the Court assumes it was the intent of the legislators not to provide for tolling under Ohio Revised Code § 4113.52. Plaintiff does not persuade the Court otherwise.

Instead, Plaintiff cites *Pytlinski v. Brocar Prod. Inc.*, 94 Ohio St.3d 77 (2002). In *Pytlinski*, however, the plaintiff's claim was brought as a wrongful discharge under the public policy exception to the at-will employment doctrine. Thus, the Supreme Court of Ohio held that the 180-day statute of limitations set forth in the Whistleblower Act did not apply to the common-law action brought by the plaintiff. In other words, the statute of limitations did not apply because it was not a Whistleblower Act claim. Here, it is undisputed that Plaintiff brings her claim under the Ohio Whistleblower Act. Thus, the facts in *Pytlinski* are inapposite.

Accordingly, Plaintiff's Whistleblower Act claim is barred by the statute of limitations and must be dismissed.

**4. Intentional Infliction of Emotional Distress**

In order to prevail on an intentional infliction of emotional distress ("IIED") claim, Plaintiff must prove: (1) Defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to Plaintiff; (2) Defendant's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) Defendant's conduct was the proximate cause of Plaintiff's psychic injury; and (4) Plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it. *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1110 (6th Cir.2008). To be liable, Defendant's behavior must go beyond intentionally tortious or even criminal behavior. *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 375, 453 N.E.2d 666, 671 (1983).

Moreover, when evaluating IIED claims, Ohio courts place great emphasis on the "seriousness" of the emotional distress. *Yeager*, 6 Ohio St. 3d at 375. "Serious emotional distress may be found where a reasonable person would be unable to cope adequately with the mental distress engendered by the circumstances of the incident." *Watkins v. Millennium School*, 290 F.Supp.2d 890, 903 (S.D. Ohio 2003) (citing *Miller v. Currie,* 50 F.3d 373, 378 (6th Cir.1995)). Serious emotional distress may not be found, however, where the plaintiff fails to show she sought medical or psychiatric help or, at least then, she must show that she was unable to function in daily life. *Id.* (citing *Miller v. City of Columbus,* 920 F.Supp. 807, 824 (S.D.Ohio 1996)).

Plaintiff argues the distress and anguish she suffered is so serious and of a nature no reasonable person could be expected to endure. (Doc. 3 at ¶ 134). Specifically, Plaintiff alleges that due in part to the pressure placed on her by her supervisor, she suffered from insomnia and

9

gastrointestinal issues. (Doc. 3 at ¶ 61). She argues that as a result of Dr. Sopirala telling her to "take care of it," the burden of an infection outbreak was more than Plaintiff could handle. (Doc. 10, PageID 86). Aside from lack of management support, Plaintiff also alleges she was removed from the outbreak investigation; removed from other projects; and disciplined for reviewing her own medical file. (*See generally* Doc. 3). She argues these things, along with compromising the safety of employees and patients, forced her to resign and give up her career. As a result of all of this, Plaintiff alleges she "decided to seek guidance for this patient safety issue and the ethical dilemma she had been placed in so she met with an employee assistance counselor." (Doc. 3 at ¶ 61). Taking Plaintiff's allegations as true, the Court finds at this early stage Plaintiff has sufficiently plead that the distress she experienced, stemming from the outbreak investigation, was so serious that she was unable to cope and thus, she sought medical or psychiatric help.

The Court is not, however, convinced that Plaintiff will ultimately be able to show that the emotional distress she suffered was of a serious enough nature. Moreover, courts have held that "'difficult work conditions,' including. . . lack of management support, are not sufficient, even if combined with a potentially discriminatory dismissal, to rise to the level of extreme and outrageous conduct to support a claim for intentional infliction of emotional distress under Ohio law." *Crespo v. Cellco Partnership*, No. 1:16-cv-679, 2016 WL 4194136, *3 (Aug. 9, 2016) (citing *Nicklas v. United Parcel Service, Inc.*, No. 1:07CV73, 2007 WL 4322220 (N.D.Ohio Dec. 7, 2007). Consequently, the Court is also skeptical that the alleged conduct, particularly toward Plaintiff, rose to the level of extreme and outrageous conduct necessary to establish a claim for IIED. Nevertheless, construing the Amended Complaint in the light most favorable to Plaintiff, accepting its allegations as true, and drawing all reasonable inferences in favor of the Plaintiff, the Court finds Plaintiff states a plausible claim for IIED.

### 5. Punitive Damages

A claim for punitive damages is not an independent claim in Ohio; rather, it is a remedy. *See Shoup v. Doyle*, 974 F.Supp.2d 1058, 1087 (S.D. Ohio 2013).  Thus, to the extent Plaintiff pleads it as an independent claim, it is dismissed.  The Court notes, however, that Plaintiff is free to seek punitive damages as a remedy for her IIED claim, if appropriate.

### IV. CONCLUSION

Consistent with the foregoing, Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Doc. 7) is **GRANTED IN PART**.  The claims against Defendant for retaliation, hostile work environment, and the Whistleblower Act are **DISMISSED WITH PREJUDICE**. Plaintiff's IIED claim remains.

**IT IS SO ORDERED.**

 /s/*Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court